**2026 UT App 112**

## THE UTAH COURT OF APPEALS

BURLINGTON COAT FACTORY WAREHOUSE CORP.,
Appellee,
*v.*
NEWGATE MALL OTHER EQUITIES LLC, NEWGATE MALL OTHER
HOLDINGS LLC, AND FASHION POINT NEWGATE LLP,
Appellants.

Opinion
No. 20250149-CA
Filed July 30, 2026

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 230900250

Robert L. Janicki and Michael L. Ford,
Attorneys for Appellants

George W. Pratt and Jack L. Darrington,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1      Newgate Mall Other Equities LLC, Newgate Mall Other
Holdings LLC, and Fashion Point Newgate LLP (collectively,
Newgate) appeal the district court's grant of partial summary
judgment in favor of Burlington Coat Factory Warehouse
Corporation (Burlington) in a dispute arising from a commercial
lease. Newgate argues that upon determining that the underlying
lease was ambiguous, the court improperly weighed extrinsic
evidence to resolve the question of the parties' intent on summary
judgment. We disagree and affirm.

BACKGROUND[1]

¶2     In 2013, the parties' predecessors-in-interest entered into a commercial lease agreement (the Lease) for retail space at the Newgate Mall (the Mall) in Ogden, Utah. Newgate and Burlington later acquired their respective interests in the Lease, with Newgate assuming the role of landlord and Burlington the role of tenant.

¶3     At the time the Lease was entered into, Dillard's and Sears operated as two of the Mall's anchor tenants. To protect against the loss of customer traffic, Article 1.25 of the Lease included a co-tenancy provision (the Co-Tenancy Provision),[2] which stated, with our emphasis,

> Operating Co-Tenancy: (i) In the event that, on the Rent Commencement Date or during the remaining Term hereof: (x) *Dillard's and Sears are not open and*

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

2. Because "anchor tenants greatly impact the economic viability of other retail tenants in a shopping center by attracting customers," co-tenancy provisions—"which are typically only found in retail leases"—"condition a retail tenant's opening or operating of its business on whether other tenant businesses in a specific shopping center are also open for business." *JJD-HOV Elk Grove LLC v. Jo-Ann Stores, LLC*, 560 P.3d 297, 299 (Cal. 2024) (quotation simplified). Such provisions typically "provide the tenant with the option to pay reduced rent, or occasionally to terminate the lease, should the provision's specified tenancy levels for the shopping center not be met." *Id.*

*operating for business in the* [*Mall*] or (y) less than sixty (60%) percent of the gross leasable area of the [Mall] (excluding leasable area of the Leased Premises and outparcels) is leased to and occupied by operating retailers (*the aforesaid conditions being hereinafter referred to as an "Operating Failure"*), then in either such event Tenant shall have the right, notwithstanding anything to the contrary contained herein . . . (A) until such time that the Operating Failure is remedied, to remain in the Leased Premises and pay to Landlord in lieu of Minimum Annual Rental, Percentage Rental, Joint Use Area Costs and Taxes an amount equal to two percent (2%) of Net Sales . . . ("Operating Failure Alternate Rent") for each and every month, payable monthly, in arrears, within twenty (20) days following the end of each calendar month . . . .

Article 1.25 also included a cure provision (the Cure Provision), which stated, again with our emphasis,

Notwithstanding anything to the contrary set forth in this Article 1.25, *in the event Dillard's and/or Sears are no longer open and operating* ("*Dark Department Stores*"), such opening and operating obligation may be satisfied by opening and occupancy of eighty-five percent (85%) of the leasable floor area of the Dark Store(s) with a regional or national replacement tenant of similar size and caliber. Tenant shall resume the payment of the Minimum Annual Rental, Percentage Rental, Joint Use Costs and Taxes specified herein upon the date that the Operating Failure ceases to exist.

¶4    In April 2018, Sears vacated its leased premises at the Mall. Subsequently, in January 2023, Burlington filed suit seeking

declaratory judgment that it was entitled to make reduced rent payments because Sears's departure constituted an "Operating Failure" under Article 1.25. Burlington also sought reimbursement for past overpayment of rent.

¶5    Following discovery, Burlington filed a motion for partial summary judgment, arguing that "Article 1.25 unambiguously provides that Sears' closure gives rise to an Operating Failure under the Lease." Specifically, quoting the portion of the Co-Tenancy Provision that states that an Operating Failure occurs if "Dillard's and Sears are not open and operating for business in the [Mall]," Burlington asserted that "if *either* Dillard's or Sears is not open and operating, then Dillard's *and* Sears are not open and operating." Burlington contended that its definition of Operating Failure was further bolstered by the Cure Provision, which allowed for a remedy "in the event Dillard's and/or Sears are no longer open and operating."

¶6    Burlington alternatively argued that if the Co-Tenancy Provision's definition of Operating Failure was ambiguous, extrinsic evidence resolved any ambiguity in its favor. Burlington asserted that the extrinsic evidence left no factual dispute as to the drafting parties' intent, and it submitted a declaration from an attorney (Attorney) who assisted in negotiating the Lease on behalf of Burlington's predecessor-in-interest and who was employed as Burlington's in-house counsel at the time of litigation.[3] In his declaration, Attorney stated that Article 1.25 "addresses what would happen if one of the . . . Mall's major tenants—Dillard's or Sears—were to vacate the premises they were leasing at the Mall" and that "the intention at the time" was "that the rent reduction described in Article 1.25 would be triggered when either one of the Mall's major tenants (Dillard's and Sears) vacated the Mall." In support of this assertion,

---

3. Burlington became the successor-in-interest to the original tenant under the Lease following a corporate merger.

Attorney attached to his declaration a copy of an initial draft of the Lease prepared by Newgate's predecessor-in-interest, and he pointed out that the initial terms of the Cure Provision were triggered, with our emphasis, "in the event *one or more* of the Department Stores referenced in this Article 1.25 are no longer open and operating ('Dark Department Stores')." And Attorney, in the declaration, also referenced a copy of his initial proposed revisions to the draft, which modified that language to expressly identify the anchor tenants: "in the event Dillard's and/or Sears are no longer open and operating ('Dark Department Stores')."

¶7 In opposing the motion for partial summary judgment, Newgate argued that under the Co-Tenancy Provision, "both Dillard's *and* Sears must cease to be open or operat[ing] to constitute an Operating Failure." Newgate further distinguished an Operating Failure under the Co-Tenancy Provision, which it argued required the closure of *both* anchor stores, from the Dark Department Stores scenario contemplated in the Cure Provision, which Newgate contended was triggered if *one or both* stores closed.

¶8 Newgate also attached to its memorandum a letter of intent (the Letter of Intent) Burlington's predecessor-in-interest drafted prior to signing the Lease. Section 28 of the Letter of Intent included the following co-tenancy provision:

> 28. Co-Tenancy: In the event, that on the Rent Commencement Date or during the remaining term of the Lease (i) the [Mall] is less than 60% occupied by operating retailers (not including Tenant or outparcels) or (ii) Dillard's & Sears are not open for business in the [Mall] (the "Co-tenancy Requirement"), Tenant may immediately pay percentage rent in the amount of 2% of gross sales in lieu of Gross Rent ("Substitute Rent") until such

>      time that the Co-Tenancy Requirement has been met.
>
>      If Landlord fails to meet the co-tenancy requirement set forth in [section] 28(ii), above and such failure continues for a period of twenty-four (24) continuous months, then Landlord may replace Dillard's & Sears with a national or regional replacement tenant of similar size and caliber to satisfy the Co-tenancy Requirement.

Newgate stated that although section 28's first paragraph was "substantially the same" as the Co-Tenancy Provision in the Lease, the second paragraph was "substantially different." Based on this, Newgate asserted that Burlington was the drafter of the Co-Tenancy Provision against whom the ambiguity should be resolved if the extrinsic evidence did not establish the drafting parties' intent.

¶9     Because Newgate's corporate predecessor-in-interest had dissolved prior to the litigation, Newgate was unable to produce extrinsic evidence of its predecessor's intent at the time the Lease was signed. Moreover, Newgate did not depose Attorney regarding his declaration.[4]

¶10     Following a hearing, the district court granted Burlington's motion for partial summary judgment. The court first ruled that Article 1.25 was ambiguous because "both sides have proffered plausible and reasonable interpretations of Article 1.25." Notably, the district court found Newgate's interpretation to be reasonable, highlighting Newgate's argument that the Cure Provision identified the closure of "Dillard's and/or Sears" as a "Dark

---

4. Newgate did present internal email correspondence between Burlington employees sent several years after the Lease's execution, but the district court ruled that the after-the-fact emails were irrelevant to "what the intent was at the time of drafting."

Department Stores" scenario rather than an "Operating Failure," which—under the Co-Tenancy Provision—occurred when "Dillard's and Sears are not open and operating for business."

¶11 The court next addressed the extrinsic evidence of the drafting parties' intent. The court did not find the initial draft of the Lease to be particularly helpful, stating that "it really is just the same language that ended up in [Article] 1.25, so it doesn't assist in supporting one versus another interpretation." But the court did find Attorney's declaration particularly persuasive, which it summarized as stating "that the intention at the time of the Lease was that the rent reduction described in Article 1.25 would be triggered when either one of the Mall's major tenants, Dillard's or Sears, vacated the Mall." The court continued,

> There's no other testimony offered that would say that the intention of either [the original landlord] at the time or [the original tenant] was . . . that it had to be both Dillard's and Sears leaving in order to trigger an Operating Failure. There's simply no evidence by any contemporaneous participation from anybody at the time the Lease was drafted as to shedding light on the intent of the parties, other than [Attorney's] really undisputed testimony that that was the intention at the time.

¶12 The court also concluded that the Letter of Intent supported—rather than disputed—Attorney's statement that "the intention at the time was that the rent reduction described in Article 1.25 would be triggered when either one of the Mall's major tenants, Dillard's and Sears, vacated the Mall." The court reasoned that the Letter of Intent clarified that what the Lease labeled a "Dark Department Stores" scenario was simply the specific cure for one of the two triggers of an Operating Failure. That is, in the court's view, section 28 of the Letter of Intent contained an explicit cross-reference: it authorized the landlord to

replace "Dillard's & Sears with a national or regional replacement tenant of similar size and caliber" to cure the scenario contemplated in subsection (ii) of section 28's first paragraph, i.e., when "Dillard's & Sears are not open for business in the [Mall]." And the final version of the Lease simply removed the explicit cross-reference, instead labeling the closing of an anchor tenant—again, one of the two scenarios that result in an Operating Failure—as a "Dark Department Stores" scenario.

¶13    The court thus ruled that "Burlington's interpretation, as a matter of law, is undisputed and supported by the undisputed evidence as presented by [Attorney's] affidavit and the supporting Letter of Intent and drafts." And following a bench trial on the issue of damages, the court entered judgment in Burlington's favor in the amount of $4,717,312. Newgate appeals.

## ISSUE AND STANDARD OF REVIEW

¶14    Newgate challenges the district court's grant of partial summary judgment in Burlington's favor. Specifically, Newgate argues that the court improperly weighed the extrinsic evidence on summary judgment to resolve Article 1.25's ambiguity in Burlington's favor. We review a district court's summary judgment ruling for correctness. *See Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 17, 474 P.3d 481.

## ANALYSIS

¶15    Newgate argues that once the district court determined that Article 1.25 was ambiguous,[5] it was improper for the court to weigh the extrinsic evidence to resolve the ambiguity as a matter

---

5. Newgate does not challenge the district court's determination of ambiguity on appeal.

of law. Newgate takes particular issue with the court's reliance on Attorney's declaration. And it further asserts that genuine issues of material fact precluded summary judgment.

¶16 The "overriding principle" of contract interpretation "is that the intentions of the parties are controlling." *Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 21, 474 P.3d 481 (quotation simplified). "And the best indication of the parties' intent is the ordinary meaning of the contract's terms." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994. But where the contract is facially ambiguous, "extrinsic evidence must be looked to in order to determine the intentions of the parties." *Id.* (quotation simplified).

¶17 In cases such as this one, where the contract is facially ambiguous, the parties' intent presents a question of fact. *Ocean 18*, 2020 UT App 54, ¶ 29. Accordingly, in such situations, "summary judgment is appropriate only if the evidence, when viewed in the light most favorable to the nonmoving party, leaves no genuine issues of fact to be resolved." *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 24, 48 P.3d 918. *See Ocean 18*, 2020 UT App 54, ¶ 29 (stating that factual questions, such as the parties' intent, "may be decided as a matter of law at the summary judgment stage, so long as the parol evidence submitted by the parties is so one-sided that a reasonable factfinder could reach but one conclusion") (quotation simplified).

¶18 Here, the district court granted partial summary judgment to Burlington on the ground that "Burlington's interpretation, as a matter of law, is undisputed and supported by the undisputed evidence as presented by [Attorney's] affidavit and the supporting Letter of Intent and drafts." On appeal, Newgate does not challenge the court's conclusion that the extrinsic evidence submitted to the court one-sidedly supported only Burlington's position. As Newgate acknowledges on appeal,

evidence of its predecessor-in-interest's intent when entering into the Lease is no longer available. Instead, Newgate seeks to discredit Burlington's extrinsic evidence, arguing that Attorney's undisputed but "self-serving" declaration did not resolve Article 1.25's ambiguity, and it takes particular issue with Attorney's statement that Article 1.25 "addresses what would happen if one of [the Mall's] major tenants—Dillard's or Sears—were to vacate the premises they were leasing at the Mall." Newgate asserts that although Attorney's "declaration purports to state Burlington's intent of Article 1.25, that intention is exactly opposite [of] what the provision of the Lease actually states," given that the Lease does not state "Dillard's or Sears" but rather "Dillard's and Sears."[6]

¶19 But the district court already determined the operative language of Article 1.25 was ambiguous because "both sides have proffered plausible and reasonable interpretations of Article

---

6. Newgate assails Attorney's declaration on two other grounds. First, it asserts that summary judgment was inappropriate because Attorney's declaration addressed only the intent of Burlington's own predecessor-in-interest and did not address the intent of Newgate's predecessor-in-interest. We disagree with this assessment. We read the declaration as asserting that both parties intended that the closing of either anchor tenant would trigger an Operating Failure.

Next, Newgate correctly points out that "Utah law has a stated preference for gleaning the intent of contracting parties, whenever possible, from written documents rather than from self-serving testimony." *Tangren Family Trust ex rel. Tangren v. Tangren*, 2006 UT App 515, ¶ 9, 154 P.3d 180 (quotation simplified), *aff'd*, 2008 UT 20, 182 P.3d 326. But here, written documents evidencing the drafting parties' intent are scant. Further, none of the documents proffered as evidence directly contradict Attorney's declaration. To the contrary, the district court found that the Letter of Intent supported Attorney's declaration.

1.25"—which ruling of ambiguity Newgate expressly agrees with on appeal. The court thus ruled that Article 1.25's language reasonably supports Burlington's interpretation. Consequently, Attorney's declaration, which reflects Burlington's interpretation, cannot be definitively discredited as contrary to the plain language of the Lease.

¶20    Newgate next contends that "[c]ontrary to the trial court's finding, the Letter of Intent creates a genuine issue of material fact that defeats Burlington's motion." In essence, Newgate rejects the district court's conclusion that the Letter of Intent's explicit cure provision authorizing the landlord to replace a no-longer-operating anchor tenant was simply carried over into the final Lease and relabeled as a "Dark Department Stores" scenario (which occurs, with our emphasis, when "Dillard's *and/or* Sears are no longer open and operating"), replacing the Letter of Intent's explicit cross-reference to section 28(ii). *See supra* ¶ 12. Instead, Newgate argues that "[w]hile there is a clear connection between the 'co-tenancy requirement' in the two paragraphs of [section] 28 of the Letter of Intent, there are clear and express differences in the 'Operating Failure' in the first few sentences of Article 1.25 of the Lease" (which, in relevant, part occurs, with our emphasis, when "Dillard's *and* Sears are not open and operating for business in the [Mall]") and the "'open[] and operating obligation' later in the same paragraph," specifically the "Dark Department Stores" scenario. Newgate then reiterates the argument it made to the district court that based on the language of Article 1.25, the Cure Provision seeks "to cure an '*open and operating obligation*' that arises with a '*Dark Department Stores*' situation" rather than the Operating Failure defined earlier in the Co-Tenancy Provision.

¶21    But again, this reliance on Article 1.25's language merely invokes the same ambiguity that the district court resolved through examining the available extrinsic evidence of the drafting parties' intent. Indeed, the court specifically highlighted the same

argument Newgate now makes as a "plausible and reasonable interpretation[]." And as discussed above, Article 1.25's underlying ambiguity will not preclude summary judgment "so long as the parol evidence submitted by the parties is so one-sided that a reasonable factfinder could reach but one conclusion." *Ocean 18*, 2020 UT App 54, ¶ 29 (quotation simplified). The one-sided evidence presented to the court—scant though it was— was sufficient to overcome the material issue of fact raised by Article 1.25's imprecise language. And Attorney's declaration, coupled with the Letter of Intent, supported Burlington's interpretation of the Lease.[7]

¶22 For these reasons, we reject Newgate's attempts to discredit the extrinsic evidence the district court determined one-sidedly supported Burlington's interpretation of Article 1.25. And given the absence of any extrinsic evidence supporting Newgate's interpretation of Article 1.25, we affirm the court's grant of partial summary judgment in Burlington's favor.

---

7. Notably, Newgate does not assert that the Letter of Intent supports its interpretation of the Lease. Instead, it asserts on appeal that the Letter of Intent creates a genuine issue of material fact that precludes summary judgment, which argument we rejected for the reasons discussed above. And in opposing partial summary judgment in the district court, Newgate presented the Letter of Intent for the purpose of establishing Burlington's predecessor-in-interest as the drafter of the Co-Tenancy Provision and argued that if the extrinsic evidence did not resolve the ambiguity, the provision should be resolved against the drafter. But we have concluded that the district court did not err in concluding that the available extrinsic evidence resolved the ambiguity. Thus, there was no occasion to resolve the ambiguity against the drafter.

CONCLUSION

¶23 Because the limited extrinsic evidence of the drafting parties' intent before the district court one-sidedly supported Burlington's position, the court did not err in resolving Article 1.25's ambiguity in favor of Burlington on summary judgment.

¶24 Affirmed.

———————